IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>AUSTIN SCHOEMANN,<br><br>　　　　　　Defendant. | Case No.  23-cr-10050-01-JWB |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, respectfully submits this memorandum in advance of the sentencing of the defendant, Austin Schoemann.  The defendant is being sentenced for his campaign of terrorizing individuals in and around Wichita because of their race or the race of individuals with whom they associated.  The defendant's conduct was serious—repeatedly threatening to kill people because they are Black and brandishing firearms to underscore his threats—and warrants significant punishment.  Moreover, the steady escalation of the defendant's misconduct and his demonstrated disrespect for the law throughout this and other incidents support that a significant term of incarceration is necessary to deter future criminal conduct and to protect the public.  For these reasons, and those below, the Government respectfully submits that an above-Guideline sentence of 84 months' imprisonment is warranted under both the departure provisions of the U.S. Sentencing Guidelines and 18 U.S.C. § 3553(a).

## PROCEDURAL HISTORY

On May 16, 2023, a federal Grand Jury issued a six count Indictment against the defendant, charging him with two counts of violating 18 U.S.C. § 245(b)(2)(F) (Interference with Federally

1

Protected Activities), one count of violating 18 U.S.C. § 924(c)(1)(A)(ii) (Brandishing a Firearm During a Crime of Violence), two counts of violating 18 U.S.C. § 875(c) (Interstate Communications – Threats), and one count of violating 42 U.S.C. § 3631 (Interference with Housing Rights). *See* Doc. 1. The charge under § 924(c)(1)(A)(ii) carried a seven-year mandatory minimum sentence, which, if the defendant had been convicted, would have run consecutive to any other sentence imposed. The defendant made his initial appearance in federal court on May 26, 2023, and was subsequently detained as a danger to the community. *See* Docs. 3, 5, 10, 11.

On July 31, 2024, the defendant pleaded guilty to a Superseding Information that included all of the above charges, except for the § 924(c)(1)(A)(ii) charge, which the Government agreed to dismiss in connection with the defendant's plea.[1] *See* Doc. 51, ¶¶ 1–2, 5. However, as part of his plea, the defendant admitted facts supporting that he had brandished multiple firearms during crimes of violence. *See id.* at ¶ 2. As part of the plea, the defendant and the Government also agreed to the imposition of a non-Guideline sentence under Federal Rule of Criminal Procedure 11(c)(1)(C), within the range of 63 to 84 months—that is, a sentence up to and including the seven-year mandatory minimum sentence that would have applied if the defendant had been convicted under § 924(c)(1)(A)(ii). *See id.* ¶¶ 3–4. The parties also agreed to the imposition of a three-year term of supervised release and a $500.00 mandatory special assessment; the defendant also agreed to forfeit one of the firearms that he brandished at several of his victims. *See id.* ¶¶ 3, 9.

## FACTUAL SUMMARY

The defendant is being sentenced for serially making violent, extreme racial threats to multiple people, including threats to kill specific Black people as well as threats to shoot up

---

[1] The Superseding Information included: Counts One and Two (violations of 18 U.S.C. § 245(b)(2)(F)); Counts Three and Four (violations of 18 U.S.C. § 875(c)); and Count Five (violation of 18 U.S.C. § 3631).

"welfare lines" and to otherwise indiscriminately murder Black people. Although the defendant first came to the FBI's attention when he, completely unprompted, threatened to shoot two Black teenagers and a Black woman who had come to the teens' aid, federal investigators later learned that the defendant had, around the same time, been terrorizing a white woman, and her family friends, based on his belief that the woman was dating and associating with Black people—a belief that prompted the defendant (a white man) to respond with violent threats.

In December 2021, the defendant began dating a white woman, M.P. M.P. ended the relationship just over one month later. After the breakup, the defendant became enraged that M.P. may have been associating with Black people—in particular, that she may have been dating Black men, a belief that (per M.P.) was entirely unfounded. For the next eight months, the defendant launched a campaign of terror and harassment against M.P., and her family and friends—sending them threatening communications; yelling slurs, insults, and threats outside of M.P.'s home; and destroying M.P.'s mother's property. Throughout, the defendant made clear that he was angry with M.P. because of her association with Black men, and he threatened to assault and kill Black men in retaliation.

For example, in late January 2022, one of M.P.'s Black friends commented on her Facebook wall that he could set her up on a date with Black friends he knew from the military. In response, the defendant texted M.P.'s friend "Ill f***ing kill you bitch" and "im on my way punk ni**er."[2] Immediately after, the defendant created a video of himself brandishing an assault rifle and two shotguns, while he stated, among other things, "Here's what I'm going to get it done with" (referring to the firearms), "Put me in front of a welfare line; I will get rid of poverty," "One cap

---

[2] The Government employed asterisks throughout this memorandum out of deference to the Court's decorum. But the defendant spelled or stated these words ("f***ing" and "ni**er") in their entirety.

3

to the head, ni**er dead," "this [shotgun] is silky smooth and yeah it will kill ni**ers," and "Bye . . . f***ing cotton-picking lazy ni**ers."  The defendant then sent the video to M.P.'s friend.

Shortly after, M.P.'s stepmother warned the defendant to stop sending threats.  In response, the defendant invoked "white power" and said that he was going to "kill" M.P.'s friend that night.  The defendant also sent M.P.'s stepmother the threatening video.  M.P.'s stepmother (who was terrified) responded that the defendant "need[ed] to slow [his] gun happy self down a notch" and "they will put you away."  She also wrote to the defendant "[You] can't keep sending people messages like you did [M.P.'s friend]… [You] messaged him shit like white power . . . ."  The defendant's response was unapologetic: "I read his shit and it pissed me off and yes white power."

Over the course of the following months, the defendant continued his brazen harassment.  He broke into M.P.'s house twice, once climbing into her bed and refusing to leave.  He rented a home just two doors down from M.P., and from that vantage point, stalked M.P.'s home, monitored her visitors, and stood outside her home yelling "nigger" and "spoobie" (a slur against non-whites).  He also repeatedly texted M.P. that he would assault, torture, and "kill" her Black visitors, and directly threatened Black visitors to M.P.'s home.  In July 2022, the defendant threw rocks through the windshield of a car outside of M.P.'s home because, as the defendant stated while he vandalized the car, he believed the car belonged to a Black man in M.P.'s home.  The car in fact belonged to M.P.'s mother, and following the incident, M.P.'s mother messaged the defendant that he should "leave [M.P.'s family] alone," and that he was "terrorizing [them] and making [them] miserable," and "making [their] lives hell."  M.P.'s mother also warned the defendant to stop "digging [his] hole," but he replied—again unapologetically—that he would keep digging, because he was "fucking white."  He also chastised M.P. for sleeping with "ni**ers" and (unsolicited) sent M.P.'s mother a picture of himself naked.

That same month, the defendant sent a lengthy, racist diatribe to M.P.'s stepmother, in which he repeatedly threatened to kill "ni**ers," including several of M.P.'s Black friends, as well as "every ni**er in this town." M.P.'s stepmother again warned the defendant to stop and told him that he would go to jail "if one more time" he "threaten[ed] to kill[ ]someone," but the defendant paid no heed. Four days after that exchange, the defendant repeated similar threats to M.P.'s stepmother. Around this time, the defendant's conduct had grown so concerning that M.P. sought and obtained a Protection from Abuse order. Then, the defendant's threats exploded beyond M.P.'s circle, to target two Black teenagers and a Black woman who were simply at a Quick Trip.

On July 27, 2022, the defendant was in his car, preparing to leave a Quick Trip, when H.A., who was then 15 years old, and S.C., who was 16, walked past the defendant's car. The teens recall that—following that simple act—the defendant honked at them, flipped the bird in their direction, yelled at them, and called them "ni**ers." The defendant also threatened to beat them, exited his car toward them, and pulled out a handgun, after which he racked the slide, and ejected a bullet from the chamber. After the defendant threatened their lives, H.A. and S.C. ran inside the Quick Trip to report the confrontation. While this confrontation was happening, a good Samaritan, L.R., who is also Black, saw that the defendant was threatening the teens and approached to try to defuse the situation. When she asked the defendant what his "beef" was, he responded "white power," leaving no question what prompted his threats. After the defendant brandished his weapon—at L.R. and the teens—he also yelled "white power" at L.R. before re-entering his vehicle and fleeing the scene.

Courts have long recognized that true threats, such as the defendant's, "inflict great harm and have little if any social value" and that "[a] threat may cause serious emotional stress for the person threatened and those who care about that person," justifying their lack of constitutional

protection. *See, e.g.*, *Elonis v. United States*, 575 U.S. 723, 746 (2015) (Alito, J., concurring). But the risk of harm here was not just theoretical—the defendant caused real harm and terror. For example, M.P. has stated that the defendant's conduct frightened and embarrassed her to the point that she avoided being home whenever possible, limited her invitations to Black friends to visit, and asked her Black friends to pick her up blocks away from her home so that the defendant wouldn't see them together. Similarly, M.P.'s mother was shaken after the defendant wrecked her car; M.P.'s stepmother was distraught by the defendant's threatening video; and both women were intensely concerned for M.P.'s safety. The defendant also terrified complete strangers—L.R. firmly believed that she was going to die when the defendant pulled his handgun on her and the teens at the Quick Trip.

But despite being told that his victims were terrified, the defendant continued to harass them. Not even law enforcement involvement stopped him. When police officers confronted the defendant about his destruction of M.P.'s mother's windshield, the defendant falsely denied responsibility and, just a couple of weeks later, he continued his pattern of racist harassment by threatening H.A., S.C., and L.R. When police officers then interviewed the defendant concerning the Quick Trip incident, he *again* falsely denied responsibility. And the defendant *again* turned back to his errant ways—in the midst of his investigation and prosecution for the Quick Trip incident, the defendant repeatedly contacted M.P. in violation of her protective order. The defendant's disregard for his victims and the law is evident throughout his Pre-Sentence Report ("PSR"). *See, e.g.*, PSR ¶¶ 22, 25–29, 31, 106, 108, 110, 118–120.

**GOVERNMENT'S PROPOSED SENTENCE**

The parties agree that the appropriate Guidelines calculation is a total offense level of 25, which, with a Criminal History Category of II, results in a Guideline range of 63 to 78 months.[3] However, while the Guideline range is the appropriate starting point for any sentence, in certain cases, the specific grounds for departure identified in the Guidelines and the sentencing factors in 18 U.S.C. § 3553(a) warrant an above-Guideline sentence.  *See, e.g.*, *United States v. Kaspereit*, 994 F.3d 1202, 1214 (10th Cir. 2021).  This is one such case.

To begin, the Guidelines expressly contemplate an above-Guideline sentence where a defendant has engaged in a campaign of terror akin to the defendant's conduct here.  The commentary to U.S.S.G. § 2A6.1, which governs the Guideline calculation for Counts Three and Four (*i.e.* the defendant's violations of 18 U.S.C. § 875(c)), states that "[i]f the offense involved (i) substantially more than two threatening communications to the same victim, (ii) a prolonged period of making harassing communications to the same victim, [or] . . . (iv) multiple victims, . . . an upward departure may be warranted."  U.S.S.G. § 2A6.1 cmnt. 4(B).  Here, the defendant pleaded guilty to sending multiple threats to "multiple victims," and the defendant's guilty plea, factual basis, and PSR make clear that he also sent "substantially more than two threatening communications to the same victim" and engaged in a "prolonged period of making harassing communications to the same victim."  An upward departure is warranted for those reasons.

In addition, the commentary to U.S.S.G. § 2A6.2, which governs the Guideline calculation for Count Five (*i.e.* the defendant's violation of 42 U.S.C. § 3631), states that "an upward departure may be warranted if the defendant stalked the victim on many occasions over a prolonged period

---

[3] The Government concurs with the U.S. Probation Office's Guideline calculation in this case in substantial part, except that the Government does not contest the defendant's objections to the calculation for Counts One and Two.

of time." U.S.S.G. § 2A6.2 cmnt.5. As the defendant's guilty plea, factual basis, and PSR make clear, the defendant did "stalk[] [M.P.] on many occasions over a prolonged period of time." The defendant moved two doors down from M.P., and for months on end, stalked, harassed, and threatened M.P., and her family and friends, because he believed that M.P. had dared to associate with Black people. The defendant's threats and harassment had their intended effect—M.P. was afraid to use her own home, or to invite Black people over or to meet Black people there, lest the defendant continue his harassment, to the point that M.P. obtained a protective order that the defendant then violated. The defendant's unrelenting conduct also terrorized M.P.'s mother and stepmother. An upward departure is warranted for that reason as well.

Finally, the sentencing factors identified in 18 U.S.C. § 3553(a) also warrant a significant, above-Guideline sentence. First, the nature and circumstances of the offenses are serious. The Defendant threatened to kill multiple people because they are Black and tormented several others because he believed they were associating with Black people. That conduct cannot be tolerated in a civil society, and the pain the defendant inflicted requires serious punishment. Further, while the defendant did not plead guilty to violating 18 U.S.C. § 924(c)(1)(A)(ii), he has allocuted to conduct that violates that statute. The defendant deserves the benefit of his plea bargain—that he would not be sentenced to a seven-year mandatory minimum sentence for brandishing a firearm during a crime of violence *in addition* to the sentence imposed for his other counts of conviction—but the sentence here should reflect the seriousness of the defendant's choice to brandish multiple weapons while threatening innocent lives, a choice that struck terror in the hearts of multiple victims. In addition, the defendant's history and characteristics, and the need to afford adequate deterrence and to protect the public, also call for a significant sentence. The defendant was repeatedly warned that his threatening conduct violated the law and terrified his victims, but he

8

continued to harass and threaten despite those warnings. Even when law enforcement became involved, the defendant demonstrated a shocking willingness to lie about his conduct and to double down on his delinquency, including by violating M.P.'s protective order. The defendant plainly requires a significant sentence to learn that his conduct cannot continue.

## CONCLUSION

For these reasons, the Government respectfully submits that a sentence of 84 months' imprisonment—six months above the defendant's Guideline range—would be proper under the Guidelines' departure provisions and sufficient, but not greater than necessary, to address the sentencing factors in 18 U.S.C. § 3553(a). The Government also requests that a three-year term of supervised release be imposed, and forfeiture ordered for the firearm that the defendant brandished at the Quick Trip, in keeping with the parties' agreement on those issues.

Respectfully submitted,

KATE E. BRUBACHER
United States Attorney

s/Aaron L. Smith
AARON L. SMITH
Assistant United States Attorney
United States Attorney's Office
301 N. Main, Suite 1200
Wichita, Kansas 67202
316-269-6481
aaron.smith3@usdoj.gov
Ks. S. Ct. No. 20447

_/s/ Erin Monju_
_____
ERIN MONJU

Trial Attorney
United States Department of Justice
Civil Rights Division, Criminal Section
150 M St. NE
Washington, D.C. 20002
202-305-5601
erin.monju@usdoj.gov
N.Y. 5160908

CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2024, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following: any attorney entering their appearance on behalf of a defendant in the above captioned case.

 s/Aaron L. Smith
Aaron L. Smith
Assistant United States Attorney